# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **AARON ADKINS**, | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00044 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

Plaintiff, Aaron Adkins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Adkins's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) (West 2003 & Supp. 2008).  This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*,

1

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Adkins protectively filed his applications for DIB and SSI on December 21, 2005, alleging disability as of June 22, 2001,[1] due to a discogenic/degenerative back disorder, degenerative joint disease in the spine, depression, nerve damage and alcohol addiction. (Record, ("R."), at 65-67, 115, 267-71.)[2] The claims were denied initially and upon reconsideration. (R. at 54-55, 58, 61-63, 272-82.) Adkins then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on October 11, 2006, at which Adkins was represented by counsel. (R. at 35-53, 64.)

By decision dated February 22, 2007, the ALJ denied Adkins's claims. (R. at 13-22.) The ALJ found that Adkins met the disability insured status requirements of the Act for DIB purposes through December 31, 2006. (R. at 15.) The ALJ found that Adkins had not engaged in substantial gainful activity since his alleged

---

[1]
    Adkins's onset date was amended to September 8, 2005, at the hearing before the ALJ. (R. at 39.)

[2]
    Adkins previously filed claims for DIB and SSI on June 27, 2001, and November 4, 2003. (R. at 28-34, 139.) Both claims were denied. (R. at 28-34, 139.)

2

onset date of September 8, 2005. (R. at 15.) The ALJ also found that the medical evidence established that Adkins had severe impairments, namely a back disorder with associated pain, borderline intellectual functioning, alcohol abuse, depressive disorder and an anxiety disorder, but he found that Adkins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart, Appendix 1. (R. at 16-17.) The ALJ found that Adkins had the residual functional capacity to perform light work,[3] but that he should avoid activities that required more than occasional balancing, stooping, kneeling, crouching and crawling, that he should avoid even moderate exposure to hazardous machinery and heights, that he would be limited to simple, unskilled work and that he should avoid direct contact with the public. (R. at 18.) Thus, he found that Adkins was unable to perform any of his past relevant work. (R. at 21.) Based on Adkins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Adkins could perform, including those of a packager, an assembler and a food preparer. (R. at 21.) Thus, the ALJ concluded that Adkins was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2007).

After the ALJ issued his decision, Adkins pursued his administrative appeals, (R. at 9), but the Appeals Council denied his request for review. (R. at 5-

---

[3]
      Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

8.)  Adkins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. §§ 404.981, 416.1481 (2007).  The case is before this court on Adkins's motion for summary judgment filed March 28, 2008, and the Commissioner's motion for summary judgment filed April 8, 2008.

## *II. Facts*

Adkins was born in 1969, which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007).  (R. at 65.)  He has a seventh-grade education.  (R. at 40, 131.)  Adkins has past work experience as a laborer in the construction business, a parts puller and mechanic at a junk yard and a roof bolter and scoop operator in the coal mining business.  (R. at 103, 112-14, 116-17.)

Adkins testified that his back problem began when he was injured in a motorcycle accident at the age of seventeen, but that his pain had worsened in the previous five or six years.  (R. at 40.)  Adkins testified that he hurt his back at "about every job" he ever worked, because he always worked jobs that required a lot of lifting.  (R. at 40.)  He stated that his most severe pain was located "half way up [his] back and [] spine and then clear up into [his] neck."  (R. at 41.)  He explained that he tried to alleviate his pain with heat treatments, pain medications and trigger point injections.  (R. at 41.)  Adkins testified that lifting a gallon of milk created "quite a bit of pressure" on his back and caused pain.  (R. at 42.)  He stated that he could walk for 15 to 30 minutes before experiencing back pain.  (R.

4

at 42.)  He stated that his pain affected his sitting and that he constantly had to change positions to help alleviate his symptoms.  (R. at 42.)

Adkins described his typical day as starting with a cup of coffee and explained that he usually petted his dog, sat on the front porch, watched television and took naps during the day.  (R. at 43.)  He testified that he occasionally visited his parents during the day.  (R. at 43.)  He testified that his parents lived about three miles from his house and that he drove himself there on occasion.  (R. at 44.)  Adkins also testified that he occasionally rode his motorcycle down to the local gas station, where he would have a cup of coffee, sit and talk with friends.  (R. at 47.)

Adkins stated that he tried to help with housework, such as doing dishes or cooking, but that his wife did the bulk of the work.  (R. at 44.)  He stated that he tried to mow the yard from time to time.  (R. at 45.)  Adkins also testified that he had a "constant little ache" in his leg, which had been operated on multiple times.  (R. at 45.)  He testified that he last worked at American Energy and that he had to stop working there because his "back snapped."  (R. at 47-48.)

John Newman, a vocational expert, also was present and testified at Adkins's hearing.  (R. at 50-52.)  Newman classified Adkins's past relevant work as a roof bolter, a general inside laborer, a scoop operator and a body mechanic as

5

heavy[4] and semi-skilled.  (R. at 51.)  He testified that Adkins would have no skills that were transferable to either sedentary[5] or light work.  (R. at 51.)  Newman was asked to consider a hypothetical individual who was limited to either light or sedentary work, who could occasionally crawl, who would need to avoid scaffolding, climbing ropes and ladders, who had a mild difficulty in interacting with the public and who was limited to simple tasks not requiring significant amounts of concentration.  (R. at 51.)  Newman testified that there would be a significant number of jobs available in the national and regional economies for such an individual, including those of a packer, an assembler and a food preparation worker, all at the light level of exertion. (R. at 52.) Newman also testified that an individual whose IQ test results were "somewhere in the seventies" would be able to perform such jobs, but that an individual who had to lie down for 30 to 60 minutes at time during the day would not be able to perform these jobs. (R. at 52.)

In rendering his decision, the ALJ reviewed records from Stone Mountain Health Services; Dr. Ranjy C. Basa, M.D.; Dr. Thomas Roatsey, D.O.; Dr. Shirish Shahane, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Donna

---

[4]
     Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carry of items weighing up to 50 pounds.  If an individual can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2007).

[5]
     Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers and small tools.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2007).

Abbott, M.A., a licensed senior psychological examiner; Dr. Frank M. Johnson, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. John Marshall, M.D.; St. Mary's Hospital; and Holston Valley Hospital. Adkins's attorney also submitted medical reports from Dr. Roatsey to the Appeals Council.[6]

Adkins presented to Stone Mountain Health Services, ("SMHS"), from December 31, 2003, to November 8, 2005. (R. at 150-80.) On December 31, 2003, Adkins reported to SMHS with a chief complaint of lower back pain. (R. at 169.) He stated that he had been taking Lortab, Soma, Mobic and tramadol for his pain. (R. at 169.) He was diagnosed by Dr. Ranjy C. Basa, M.D., with chronic lower back pain. (R. at 169.) Adkins again was seen by Dr. Basa on January 30, 2004, for a follow-up regarding his back pain. (R. at 167.) Adkins complained of continued back pain accompanied by muscle tightness and neck pain. (R. at 167.) He also reported depression. (R. at 167.) Dr. Basa's examination revealed no direct tenderness or spasms, no palpable deformities, a negative straight leg raising test, no neurologic deficits and 2+ deep tendon reflexes. (R. at 167.) Dr. Basa diagnosed chronic lower back pain and depression and prescribed Vioxx, Ultracet and Paxil. (R. at 167.) A magnetic resonance imaging, ("MRI"), report dated May 14, 2004, revealed a normal thoracic spine, but a minimal annular bulge at the L5-S1 level of

---

[6]
Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

the lumbar spine. (R. at 174.) Adkins returned to SMHS on August 11, 2004,[7] and stated that Ultracet was not helping his back pain. (R. at 163-64.) Adkins was diagnosed with chronic lower back pain and depression. (R. at 163.) He was discontinued from Ultracet and was prescribed Lortab for his pain. (R. at 163.) Adkins was again seen on September 24, 2004, and was diagnosed with chronic lower back pain/disc disease and depression. (R. at 161.) On December 23, 2004, Adkins reported that Lortab and Soma were helping his pain, and he was again diagnosed with chronic lower back pain/disc disease. (R. at 159.)

Adkins returned to SMHS on July 7, 2005, for a follow-up regarding his lower back pain and depression. (R. at 156.) Dr. Thomas Roatsey, D.O., reported tenderness in Adkins's back, decreased flexion and a "mildly positive" straight leg raising test on the left. (R. at 156.) Dr. Roatsey also noted that Adkins was able to toe and heel walk and that he had +2/4 reflexes equal bilaterally. (R. at 156.) Adkins was diagnosed with chronic lower back pain and depression. (R. at 156.) Adkins returned on September 8, 2005, requesting cortisone shots to help alleviate his back pain. (R. at 153.) He reported that these shots had helped him in the past. (R. at 153.) Dr. Roatsey administered three trigger point injections and continued Adkins on the same medications. (R. at 154.) Adkins returned for a follow-up on November 8, 2005, and continued to report severe pain. (R. at 150.) Dr. Roatsey noted some guarding and a negative straight leg raising test and diagnosed chronic lower back pain and depression. (R. at 150.) Dr. Roatsey informed Adkins that the "symptoms and amount of pain that he [was] describing just [did not] go with

---

7 The medical records on this date and on September 24, 2004, and December 23, 2004, are mostly illegible. (R. at 159, 161, 163-64.)

the MRI . . . ."  (R. at 151.)  Dr. Roatsey asked Adkins to consider seeing a neurosurgeon.  (R. at 151.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., a licensed senior psychological examiner, examined Adkins on March 20, 2006, and completed a psychology report at the request of the Virginia Department of Rehabilitative Services. (R. at 183-89.) Adkins reported that he attempted suicide two to three years prior to his visit, for which he was hospitalized. (R. at 184.) He reported drinking a lot of alcohol when he was younger, but stated that he quit drinking about a year prior to his visit, and that he currently drank a beer only occasionally.  (R. at 184.) Adkins also reported being hospitalized at St. Mary's Hospital[8] a few months prior to his visit after a separate suicide attempt. (R. at 184.) Adkins reported a seventh-grade education.  (R. at 185.)

Lanthorn and Abbott noted that Adkins related appropriately to them, and that he should be able to relate adequately to others. (R. at 186.) Lanthorn and Abbott administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), on which Adkins obtained a verbal IQ score of 72, a performance IQ score of 69 and a full-scale IQ score of 68, which placed him at the extremely low range of current intellectual functioning.  (R. at 186.)  Lanthorn and Abbott noted that Adkins's effort appeared to be marginal at times, and they stated that his potential might be higher, perhaps in the borderline range. (R. at 185, 187.)

---

[8]     The medical records show that Adkins was last hospitalized at St. Mary's Hospital in July of 2002.  (R. at 182, 236.)

Lanthorn and Abbott diagnosed alcohol abuse, mild mental retardation, and assessed Adkins's Global Assessment of Functioning, ("GAF"), score at 60.[9]  (R. at 187.) Lanthorn and Abbott found that Adkins might have difficulty with complex instructions and maintaining routine.  (R. at 187.)  They also found that Adkins could attend and concentrate, that he had a mild limitation in general adaptation, that he could be aware of normal hazards and take precaution, that he could set goals and make plans and that he might have some mild to moderate difficulty adapting to change and dealing with stress.  (R. at 187-88.)  Lanthorn and Abbott noted that Adkins did not report significant anxiety or depression and that, from a mental standpoint, none was observed.  (R. at 188-89.)

Dr. Shirish Shahane, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on April 12, 2006.  (R. at 190-95.)  Dr. Shahane found that Adkins retained the residual functional capacity to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of six hours in a typical eight-hour workday and sit for a total of about six hours in a typical eight-hour workday.  (R. at 191.)  He also found that Adkins had an unlimited ability to push and/or pull, but that he would be able to only occasionally balance, stoop, kneel, crouch or crawl, and that he could never

---

[9]
    The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. . . ." DSM-IV at 32.

Case 2:07-cv-00044-JPJ-PMS   Document 15   Filed 06/27/08   Page 10 of 22   Pageid#: 80

climb a ladder, rope or scaffold.  (R. at 191-92.)  Dr. Shahane imposed no manipulative, visual, communicative or environmental limitations, with the exception that Adkins should avoid even moderate exposure to hazards such as heights or machinery.  (R. at 192-93.)

On April 12, 2006, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Adkins suffered from an affective disorder, namely depression, and a substance addiction disorder.  (R. at 197-209.)  Leizer found that Adkins had a mild restriction in his activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation.  (R. at 207.)

Leizer also completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on April 12, 2006.  (R. at 210-12.)  Leizer found that Adkins was moderately limited in his ability to understand, remember and carry out detailed instructions, to interact appropriately with the public, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others.  (R. at 210-11.)

On June 13, 2006, Dr. Frank M. Johnson, M.D., another state agency physician, completed a PRFC with the same findings as those of Dr. Shahane.  (R. at 213-18.)  Dr. Johnson added that Adkins's allegations were not supported by the evidence and were not considered fully credible.  (R. at 218.)

11

On June 13, 2006, Louis Perrott, Ph.D., another state agency psychologist, completed a PRTF with the same findings as those of Leizer. (R. at 219-32.)

On June 13, 2006, Perrott completed a MRFC with the same findings as those of Leizer. (R. at 233-35.) Perrott added that Adkins's statements were found to be partially credible and that Adkins was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment. (R. at 235.)

On July 17, 2006, Adkins presented to Dr. John Marshall, M.D., after being referred by Dr. Roatsey. (R. at 250.) Adkins reported cervical and bilateral upper extremity pain and paresthesias, lower back and bilateral lower extremity pain and paresthesias. (R. at 250.) Dr. Marshall reported that Adkins was capable of tiptoe, heel and midline walking, had normal motor strength in his upper and lower extremities, had some pain to palpation, had some pain with neck extension and that he had reduced lumbar lordosis. (R. at 250-51.) He diagnosed diffuse musculosketal pain, possible mild early degenerative changes, depression and anxiety. (R. at 251.) Dr. Marshall also noted a normal MRI of the thoracic spine performed in 2004, no definite disc herniation and no spinal stenosis. (R. at 251.) Dr. Marshall further reported that he was "not quite sure how to make Mr. Adkins['s] pain drawing. [Adkins] is having fairly diffuse symptoms." (R. at 251.) He ordered additional testing to help further evaluate Adkins. (R. at 251.)

A bone scan dated August 22, 2006, from Holston Valley Hospital revealed no scintographic evidence of acute osseous abnormality. (R. at 247-48.) Adkins

12

underwent electrodiagnostic testing, performed by Dr. Marshall on August 29, 2006. (R. at 257.) The testing resulted in a normal electromyogram, ("EMG"), and a normal nerve conduction velocity test, ("NCV"). (R. at 257.) Dr. Marshall recommended clinical correlation. (R. at 257.) Dr. Marshall also suggested that Adkins undergo a cervical MRI. (R. at 249.)

Adkins presented to Dr. Roatsey on August 30, 2006, with a chief complaint of continued back pain. (R. at 261.) Dr. Roatsey stated that Adkins "does not feel well," and he noted that Adkins's back was tender. (R. at 261.) A straight leg raising test was positive and was accompanied by moderate guarding. (R. at 261.) Adkins was diagnosed with chronic back pain, depression and anxiety, and his Soma and Lortab dosages were increased. (R. at 261.) Adkins was seen again at SMHS on January 17, 2007, for a follow-up regarding his lower back pain and depression. (R. at 287.) Dr. Roatsey reported that Adkins was "doing a little better." (R. at 287.) A musculoskeletal examination revealed a tender back and decreased range of motion. (R. at 287.) Adkins was diagnosed with chronic back pain, depression and anxiety. (R. at 287.) Adkins again saw Dr. Roatsey on March 5, 2007, for another follow-up regarding his back pain and depression. (R. at 284.) A musculoskeletal examination revealed a tender back and decreased range of motion, and Adkins was diagnosed with chronic back pain and depression. (R. at 284.) Adkins's blood pressure was elevated, which Dr. Roatsey noted was possibly due to Adkins's back pain. (R. at 284.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether the claimant: 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairment. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

14

By decision dated February 22, 2007, the ALJ denied Adkins's claims.  (R. at 13-22.)  The ALJ found that Adkins met the disability insured status requirements of the Act for DIB purposes through December 31, 2006.  (R. at 15.)  The ALJ found that Adkins had not engaged in substantial gainful activity since his alleged onset date of September 8, 2005.  (R. at 15.)  The ALJ also found that the medical evidence established that Adkins had severe impairments, namely a back disorder with associated pain, borderline intellectual functioning, alcohol abuse, depressive disorder and an anxiety disorder, but he found that Adkins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart, Appendix 1.  (R. at 16-17.)  The ALJ found that Adkins had the residual functional capacity to perform light work, and further found that he should avoid activities that required more than occasional balancing, stooping, kneeling, crouching and crawling, that he should avoid even moderate exposure to hazardous machinery and heights, that he would be limited to simple, unskilled work and that he should avoid direct contact with the public.  (R. at 18.)  Thus, he found that Adkins was unable to perform any of his past relevant work.  (R. at 21.)  Based on Adkins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Adkins could perform.  (R. at 21.)  Thus, the ALJ concluded that Adkins was not under a disability under the Act and was not eligible for DIB or SSI benefits.  (R. at 22.)  *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2007).

In his brief, Adkins argues that the ALJ erred by improperly determining Adkins's residual functional capacity.  (Plaintiff's Motion For Summary Judgment

15

And Memorandum Of Law, ("Plaintiff's Brief"), at 5-7.)  Adkins also argues that the ALJ erred by failing to properly evaluate Adkins's subjective complaints regarding the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 7-9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence.  *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.)  While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the

factors set forth at 20 C.F.R. §§ 404.1527(d) and 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Adkins's first argument is that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 5-7.) I agree. The ALJ states that he "agrees with the opinions of [Lanthorn and Abbott] . . ." and the ALJ concluded that Adkins "has borderline intellectual functioning, which would reflect a full-scale IQ score at least in the range of 71-84." (R. at 20.) However, Lanthorn and Abbott determined that Adkins's verbal IQ score was 72, his performance IQ score was 69 and his full-scale IQ score was 68, which placed him at the extremely low range of current intellectual functioning. (R. at 186.) Lanthorn and Abbott noted that Adkins's effort appeared to be marginal at times, and they stated that his potential might be higher, perhaps in the borderline range. (R. at 187.) However, Lanthorn and Abbott never made a finding that Adkins's intellectual ability was in the borderline range, but rather, they diagnosed mild mental retardation. (R. at 187.) Furthermore, Lanthorn and Abbott did not suggest that the IQ tests scores were not valid.

An ALJ may not simply disregard uncontradicted expert opinions in favor of his own opinion on a subject that he is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984). "In the absence of any psychiatric of psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985)

Case 2:07-cv-00044-JPJ-PMS   Document 15   Filed 06/27/08   Page 17 of 22   Pageid#: 87

(citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).   As a result, the ALJ's determination of Adkins's residual functional capacity is not supported by substantial evidence within the record.   On remand, the ALJ should make a finding based on substantial evidence as to whether Adkins's mental residual functional capacity is greater than that determined by Lanthorn and Abbott, and not merely substitute his own opinion.   If the ALJ determines that Adkins's IQ scores were valid, the ALJ should then consider whether Adkins's impairments meet or equal Listing 12.05.   *See* 20 C.F.R. Part 404, Subpart, Appendix 1, § 12.05(C) (2007).   I also should note that if, on remand, the ALJ finds that Adkins is disabled, then the ALJ should determine whether Adkins "would still [be found] disabled if [he] stopped using drugs or alcohol."[10]  20 C.F.R. §§ 404.1535, 416.935 (2007).

Adkins's second argument is that the ALJ erred by failing to properly evaluate his subjective complaints regarding the effect of pain on his ability to perform substantial gainful activity.   (Plaintiff's Brief at 7-9.)   On this matter, I disagree.   The United States Court of Appeals for the Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain.   *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996).   First, there must be some objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant.   *See Craig*, 76 F.3d at 594.   Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain

---

[10]      Lanthorn and Abbott diagnosed alcohol abuse.  (R. at 187.)  In addition, Leizer and Perrott found that Adkins suffered from a substance addiction disorder.  (R. at 197-209, 219-32.)

Case 2:07-cv-00044-JPJ-PMS   Document 15   Filed 06/27/08   Page 18 of 22   Pageid#: 88

affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. . . .

76 F.3d at 595.

Here, the ALJ found that "[Adkins's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Adkins's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (R. at 19.) The ALJ, therefore, found that the first prong of the pain analysis was satisfied, but that the objective medical evidence of record did not support Adkins's subjective allegations regarding his symptoms.

The ALJ's decision reflects that he adequately considered all of the evidence. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (2007). The ALJ supported his determination with evidence that Adkins had undergone conservative treatment for his pain for some time, that there had been normal EMG and NCV testing, as

19

well as a normal whole body scan, that Adkins could tiptoe, heel and midline walk and that he exhibited normal motor strength in his upper and lower extremities. (R. at 19.) The ALJ also noted that Adkins could bathe and dress himself, mow the lawn, cook, wash dishes, go grocery shopping and run errands. (R. at 19.) Moreover, he pointed out that Adkins sat through a 60-minute hearing without exhibiting any signs of pain. (R. at 19.)

It is well-settled that an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record, and that credibility determinations as to a claimant's testimony regarding a claimant's pain are for the ALJ to make. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions will be given great weight. *See Shively*, 739 F.2d at 989-90 (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)). In this case, the ALJ properly relied on evidence that is found within the record, and, thus, I find that substantial evidence supports the ALJ's finding that Adkins's pain allegations were not supported by the objective medical evidence of record.

Based on the above, I find that substantial evidence does not exist in this record to support the ALJ's finding that Adkins was not disabled, and I recommend that the court deny Adkins's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying an award of DIB and SSI benefits and remand this case for further consideration.

20

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence does not exist in the record to support the Commissioner's finding as to Adkins's mental residual functional capacity;

2.  Substantial evidence exists in the record to support the Commissioner's finding as to Adkins's subjective allegations of pain; and

3.  Substantial evidence does not exist in the record to support the Commissioner's finding that Adkins was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that this court deny Adkins's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying an award of DIB and SSI benefits and remand Adkins's claims to the Commissioner for further consideration. The undersigned also recommends that the court deny Adkins's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

Case 2:07-cv-00044-JPJ-PMS   Document 15   Filed 06/27/08   Page 21 of 22   Pageid#: 91

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 27th day of June 2008.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

Case 2:07-cv-00044-JPJ-PMS   Document 15   Filed 06/27/08   Page 22 of 22   Pageid#: 92